

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Richmond Division

| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 3:14-cr-168 |
|---|---|---|
| | ) | |
| v. | ) | 18 U.S.C. § 1349 |
| | ) | Conspiracy to Commit Bank Fraud |
| WALTER LEVERING HOOKER, | ) | |
| | ) | 18 U.S.C. §§ 981 & 982 and |
| Defendant. | ) | 21 U.S.C. § 853(p) |
| | ) | Criminal Forfeiture Allegation |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### CONSPIRACY TO COMMIT BANK FRAUD

#### Introduction

At all times relevant to the conspiracy alleged in this Criminal Information:

1. Defendant WALTER LEVERING HOOKER was an attorney practicing law in Richmond, Virginia. His practice concentrated primarily in the area of real estate closings. HOOKER employed Margarette Stanton (charged in this Court under docket number 3:13-mj-447) and Unindicted Co-conspirator A (UC-A) to assist with real estate closings. Their duties included assistance with the closing of loans and preparation of HUD-1 forms used to report the disposition of closing proceeds to lenders and other parties to transactions.

2. Co-conspirators Marvin Leon Clair, Joyce Denise Deer, Tiffany Nicole Clair, and Janelle Irene Davis (all charged in this Court under docket number 3:13-cr-172), as well as Jeffrey Paul Evans (charged in this Court under docket number 3:14-cr-14) were a group of individuals

(collectively, "the Clair group") who engaged in the purchase and sale of real property in the Richmond area and elsewhere. HOOKER was the closing attorney for many of these transactions.

3. Unindicted Co-conspirator B (UC-B) was a local mortgage broker who regularly used HOOKER's services for real estate closings. Unindicted Co-conspirators (UCs C and D) were employed as mortgage brokers at various times by Aggressive Mortgage, C&F Mortgage Corporation, and Virginia Mortgage Bankers. UC-C and UC-D often worked under UC-B at these entities.

4. Many of the loans closed by HOOKER's office were guaranteed by the Federal Housing Administration (FHA), a subdivision of the United States Department of Housing and Urban Development, or the Veteran's Administration (VA).

## The Conspiracy to Commit Bank Fraud

Beginning prior to December 2004, continuing through in or about at least May 2011, in the Eastern District of Virginia and within the jurisdiction of this Court, as well as elsewhere, defendant WALTER LEVERING HOOKER, Margarette Stanton, Marvin Leon Clair, Joyce Denise Deer, Tiffany Nicole Clair, Janelle Irene Davis, Jeffrey Paul Evans, and Unindicted Co-conspirators A-D, did knowingly combine, conspire, and agree with each other and others, both known and unknown, to commit an offense against the United States, that is: to knowingly, unlawfully, and with intent to defraud, execute and attempt to execute a scheme and artifice to defraud financial institutions (as that term is defined in Title 18, United States Code, Section 20) and obtain money, funds, and property owned by and under the custody and control of said

financial institutions, by means of materially false and fraudulent pretenses and promises, in violation of Title 18, United States Code, Section 1344.

## Object of the Conspiracy

The object of the conspiracy was for HOOKER and co-conspirators to make and cause the making of materially false statements on mortgage borrowers' settlement statements (HUD-1s) sent to mortgage lenders. These transactions generated the following monies: (a) commissions and legal fees connected with the loan closings; and (b) other funds which were to be paid to the borrowers at closing, but which actually went to the co-conspirators.

## Ways, Manner, and Means of the Conspiracy

The ways, manner, and means by which the object of the conspiracy was accomplished included, but were not limited to, the following:

1. Monies advanced by the lenders in connection with the Clair group closings were sent to HOOKER's real estate trust accounts in accordance with standard real estate closing procedures. HOOKER's employees, including UC-A and Stanton, acting at his direction, disbursed the loan proceeds in accordance with the wishes and directives of Marvin Clair, Deer, Tiffany Clair, Janelle Davis, and Jeffrey Evans. These disbursements were misrepresented on the HUD-1 settlement forms prepared by HOOKER's firm and sent to lenders.

2. In some instances, monies advanced from the Clair group lenders were paid directly from the real estate trust accounts to purchasers and other parties involved in the transactions.

3. In other instances, the funds lent to the Clair group borrowers were applied toward fictitious settlement charge items such as non-existent improvements on the purchased properties that never took place. Monies applied toward these fictitious items were paid to companies owned and controlled by Marvin Clair, Deer, Tiffany Clair, Davis, Evans, or others, via transfers from the real estate trust accounts. The monies were then paid to the purchasers, sellers, or other parties to the transactions.

4. The HUD-1 settlement forms prepared by HOOKER's firm in connection with the Clair group closings were accompanied by certifications attesting to their accuracy signed by the purchaser and seller. These HUD-1 settlement forms, which were sent to lenders, failed to disclose payments made to the purchasers, sellers, and other parties out of lender's funds held in the firms' real estate trust accounts. To the extent that those advanced funds were then sent to the purchaser to be brought to closing as cash or credited at closing on the HUD-1 as "Cash from Borrower," the lenders were deceived as to the source of those funds.

5. HOOKER engaged in a similar practice with mortgage loans originated by UCs B-D. These loans were originated most often in connection with "cash-out" refinances. The funds paid to the borrowers from these "cash-out" refinances were often used for home repairs. Almost all the mortgage referrals related to these "cash-out" refinances came from a single contractor. This contractor generally referred borrowers who were unable to obtain financing from other sources.

6. During the loan origination process, UCs B-D or others (including the contractor referenced previously) often paid off credit card bills or other consumer debt for borrowers so the debt would not appear on their credit reports, with the agreement that the borrower would repay

them from the funds received from the refinancing at closing. The borrowers did not report the sums owed to UCs B-D and others on loan applications, which misled lenders as to the borrowers' creditworthiness.

7. UCs B-D and others were compensated for the funds they had expended to pay off borrowers' debts from funds that were to be paid to the borrowers at closing.

8. UCs B-D also collected funds from borrowers' proceeds as payment for their services in originating the loans in question. These monies, which came out of the funds paid to borrowers at closing, were paid in addition to the commissions UCs B-D were authorized to receive. Neither their employers nor the lenders knew that that these additional sums were being paid out at closing.

9. Stanton, UC-A, and other persons employed by HOOKER regularly prepared or facilitated the preparation of HUD-1 settlement statements for submission to lenders and other parties that failed to disclose the sums paid out to UCs B-D and others as reimbursement for funds expended in payment of borrowers' debts and as additional compensation discussed previously. These HUD-1 settlement statements hid from the lenders, the FHA, and the VA the actual disbursement of proceeds from the refinancing of the properties.

10. Stanton, UC-A, and other persons employed by HOOKER, acting at the direction of HOOKER and UCs B-D, prepared two versions of the HUD-1 Settlement Statement for a number of transactions: one to be sent to the mortgage lender, reflecting false disbursements of the loan proceeds; and another that matched the disbursement ledger kept in HOOKER's settlement files, which reflected the true disbursement of loan proceeds and closing funds.

(In violation of Title 18, United States Code, Section 1349).

## **CRIMINAL FORFEITURE ALLEGATION**

Pursuant to Rule 32.2(a) FED. R. CRIM. P., the defendant is hereby notified that, if convicted of the offense alleged in this Criminal Information, the defendant shall forfeit to the United States his interest in any property constituting, or derived from, gross proceeds obtained directly or indirectly as the result of such violation, and any assets which may be directly forfeitable as gross proceeds. If property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets, **including a money judgment in the amount of at least $4,773,070.73.**

(In accordance with Title 18, United States Code, Sections 982(a)(2) and 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c).)

DANA J. BOENTE
UNITED STATES ATTORNEY

By: _/s/ Michael C. Moore_
Michael C. Moore
Assistant United States Attorney